# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| WARREN GENERAL HOSPITAL, on behalf of itself and all others similarly situated, | |
| Plaintiff, | Civil Case No. |
| v. | ANTITRUST CLASS ACTION COMPLAINT |
| BAXTER INTERNATIONAL INC.; BAXTER HEALTHCARE CORPORATION; HOSPIRA, INC. and HOSPIRA WORLDWIDE, INC., | JURY TRIAL DEMANDED |
| Defendants. | |

510836.1

# TABLE OF CONTENTS

**Page**

NATURE OF ACTION ............................................................................................... 3

JURISDICTION AND VENUE ................................................................................. 8

PARTIES .................................................................................................................. 10

    A.    Plaintiff ...................................................................................................... 10

    B.    Defendants ................................................................................................. 10

AGENTS AND CO-CONSPIRATORS ................................................................... 11

FACTUAL ALLEGATIONS .................................................................................. 12

    A.    The IV Saline Solution Industry .............................................................. 12

    B.    The Purported IV Saline Solution Shortage ............................................ 13

    C.    Congress Urges The FTC To Investigate Defendants For Conspiring to Restrict Output And Increase Prices of IV Saline Solution ................................. 15

    D.    Defendants Unlawfully Stifled Competition by Colluding to Restrict Output and Increase Prices for IV Saline Solution ................................................ 16

          1.    Defendants Issued A Series of Voluntary Product Recalls And To Create And Maintain Their Output Control Conspiracy .......................... 17

          2.    Defendants Signaled The Timing And Frequency Of Their Intended Output Restrictions And Price Increases Through The FDA's Shortage Website ........................................................................ 19

          3.    Defendants Exploited Their Market Power And The Purported IV Saline Solution Shortage By Collusively Pressuring Customers To Abide By Restrictive Purchasing Terms ................................................ 21

    E.    Defendants' Conspiracy Had The Purpose And Effect Of Raising Prices For IV Saline Solution In The United States During The Class Period .............. 22

    F.    The IV Saline Solution Market Structure And Characteristics Support The Existence Of A Conspiracy ....................................................................... 26

          1.    The Market For IV Saline Solution Is Highly Concentrated .................. 26

          2.    The Market For IV Saline Solution Has High Barriers To Entry ........... 28

          3.    The Demand For IV Saline Solution Is Inelastic .................................... 29

          4.    IV Saline Solution Is A Highly Homogeneous Product .......................... 30

          5.    Defendants Had Ample Opportunities To Meet and Conspire ............... 31

          6.    Defendants Had Motives To Conspire .................................................... 32

          7.    IV Saline Solution Prices Rose Despite Falling Raw Material Prices And Defendants' Increased Economies Of Scale ......................... 33

-i-

8.     Similar Supply Shortages And Price Increases For IV Saline
       Solution Did Not Occur During Other Flu Outbreaks ............................ 34

9.     Defendant Baxter Is A Recidivist Violator Of The Antitrust Laws......... 34

CLASS ACTION ALLEGATIONS ............................................................................... 35

PLAINTIFF AND THE CLASS SUFFERED ANTITRUST INJURY ...................................... 37

JURY DEMAND ......................................................................................................... 41

Plaintiff Warren General Hospital ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class," as defined below), upon personal knowledge as to the facts pertaining to itself and upon information and belief as to all other matters, and based on the investigation of counsel, brings this class action for damages, injunctive relief and other relief pursuant to federal antitrust laws, demands a trial by jury, and alleges as follows:

## NATURE OF ACTION

1.      This lawsuit is about a conspiracy among the major U.S. manufacturers of a critical medical product, intravenous ("IV") saline solution ("IV Saline Solution"), to restrict output and artificially fix, raise, maintain and/or stabilize the prices of IV Saline Solution sold throughout the United States under the pretext of a supply shortage, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

2.      Plaintiff seeks to represent itself and a Class consisting of all persons and entities in the United States who directly purchased IV Saline Solution from Defendants Baxter International Inc. and Baxter Healthcare Corporation (together, "Baxter"), and Hospira, Inc. and Hospira Worldwide, Inc. (together, "Hospira") (collectively, "Defendants"), or any current or former agent, subsidiary or affiliate thereof, or any co-conspirator, during the period from and including January 1, 2013 through such time as the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period").

3.      Defendants dominate and collectively control approximately 90% of the $1.2 billion a year IV Saline Solution market in the United States.

4.      IV Saline Solution is used for a countless variety of medical treatments, including preventing dehydration and diluting IV medications.  IV Saline Solution is also one of the most

commonly used products in emergency medicine. Over a billion units of IV Saline Solution are used in the United States every year.

5.    As recognized by Defendant Baxter's spokesman John O'Malley, "IV solutions are critical medications and fundamental to the delivery of patient care."[1]  In hospitals, "IV fluids impact almost every single patient and every single floor."[2]

6.    A shortage of IV Saline Solution is creating a health care crisis.  According to Carol A. Cunningham, MD of the Akron General Medical Center, when faced with a shortage of IV Saline Solution: "It became really scary when we didn't have saline.  I felt like we were practicing medicine in a third-world country. There was just no way of giving fluid resuscitation or treating dehydration intravenously."[3]

7.    On October 26, 2015, a bipartisan group of U.S. Senators urged the Federal Trade Commission ("FTC") to investigate Defendants for illegal collusion in violation of the antitrust laws in connection with the sale of IV Saline Solution.  According to the Senators, Defendants publicly asserted that there was a shortage of IV Saline Solution and, based on the purported shortage, which ostensibly began in 2013, Defendants increased their IV Saline Solution prices by 200-300%.[4]

---

[1] *IV shortage tests providers and suppliers,* REPERTOIRE, (June 2014), http://www.repertoiremag.com/iv-shortage-tests-providers-and-suppliers.html.

[2] April Dembosky, KQED, *Saline shortages create troubles for U.S. hospitals*, PBS NEWSHOUR, (Jun. 25, 2014), http://www.pbs.org/newshour/rundown/saline-shortages-create-troubles-u-s-hospitals/.

[3] Lena J. Weiner, *Basic Emergency Department Meds in Short Supply*, HEALTHLEADERS MEDIA, (June 12, 2015), http://www.healthleadersmedia.com/quality/basic-emergency-department-meds-short-supply.

[4] Press Release, U.S. Senator Orrin Hatch, Blumenthal, Lee, Klobuchar, Hatch Urge FTC to Investigate Antitrust Violations Connected to IV Solution Shortages, Increasing Costs of Hospital Operations and Patient       Care       (Oct.       26,       2015)       ("Press       Release"),
*(continued)*

4

8.     The Senators estimated that these price increases have had a devastating economic impact on hospitals, which cannot properly function without IV Saline Solution, by increasing their individual annual costs in the range of hundreds of thousands to millions of dollars.  As recognized by the Senators, the claimed IV Saline Solution shortage is estimated to be the most expensive drug shortage in history.

9.     In December 2015, the FTC declined to confirm or deny whether it is investigating the Defendants.

10.     The purported IV Saline Solution shortage dates as far back as November 2013, when Defendants began to notify their health care facility customers that they may experience delays in IV Saline Solution deliveries.   By January 2014, the U.S. Food and Drug Administration ("FDA") publicly acknowledged a shortage of IV Saline Solution in the United States.

11.     Defendants publicly blamed the shortage on a nationwide spike in IV Saline Solution consumption that occurred as a result of announcements by Defendants in late 2013 regarding expected delivery delays and an allegedly harsher-than-expected 2013 to 2014 flu season.  However, as recognized by the bipartisan group of Senators in their October 2015 letter to the FTC, "the shortage is still ongoing . . . raising questions about the incentives of the saline suppliers to solve this problem and about possible coordination among them."   Indeed, one

_(continued)_

http://www.hatch.senate.gov/public/index.cfm/2015/10/blumenthal-lee-klobuchar-hatch-urge-ftc-to-investigate-antitrust-violations-connected-to-iv-solution-shortages-increasing-costs-of-hospital-operations-and-patient-care.

economist and professor stated that "[s]aline shortages are something that shouldn't happen, they baffle economists."[5]

12.     In fact, the purported IV Saline Solution shortage was part of an unlawful anticompetitive and collusive output restriction and price-fixing scheme orchestrated by Defendants.   Beginning no later than January 2013, Defendants used several methods to implement and facilitate their conspiracy, including issuing several unprecedented (and nearly parallel) product recalls and signaling to each other their intent to restrict supply of IV Saline Solution to the market.

13.     Prior to 2013, there were only sporadic product recalls by multiple IV Saline Solution manufacturers.   However, starting in 2013, Defendants Baxter and Hospira, who collectively control approximately 90% of the U.S. IV Saline Solution market, implemented numerous and nearly parallel *voluntary* recalls of their IV Saline Solution for similar reasons.  In October 2014 alone, Defendant Hospira's voluntary recall removed approximately 82.5% of the average estimated monthly supply of IV Saline Solution bags from the U.S. market.

14.     Defendants also signaled to each other their intent to restrict supply of IV Saline Solution by exchanging information through the FDA's Drug Shortage website.  At or around the same time, Defendants placed customer letters on the website which stated that they were facing supply constraints and would be allocating output of IV Saline Solution and other IV solution products.

---

[5] Valerie Lapointe, *Hospital Drug Shortages: What is Really Causing Them?*, MEDILL REPORTS CHICAGO (May 26, 2016), http://news.medill.northwestern.edu/chicago/hospital-drug-shortages-what-is-really-causing-them/.

15.     To make matters worse, both Defendant Baxter and co-conspirator B. Braun Medical Inc. ("B. Braun") indicated that they would not take on any new customers, or may only do so on a case-by-case basis.  As a result, health care facilities' ability to seek lower prices from ostensibly competing manufacturers has been restrained.

16.     The purported IV Saline Solution shortage persists today, even though Defendants claim to be running at full capacity.

17.     Further, the purported IV Saline Solution shortage has not been resolved despite the fact that the FDA took steps to address the shortage by allowing coordination with foreign suppliers (including a subsidiary of Defendant Baxter) to import IV Saline Solution into the United States.

18.     Defendants' purported justifications for the IV Saline Solution shortage are a pretext for their collusive anticompetitive conduct.  A harsher-than-expected flu season nearly two years ago cannot justify or explain escalating IV Saline Solution prices today.  During earlier major flu outbreaks, there was no corresponding product shortage or sharp price increases for IV Saline Solution.

19.     Further, prices of raw materials needed to produce IV Saline Solution cannot justify the rising prices.  The cost of plastic, a main component of IV Saline Solution, remained stable between 2013 and 2014, and dropped sharply in the last quarter of 2014.

20.     At least one Defendant, Baxter, is a recidivist violator of the antitrust laws. Baxter was previously accused of orchestrating a similar artificial supply shortage to increase prices of plasma-derivative protein therapies.  Baxter settled a private class action relating to this conduct for $64 million in 2014.

7

21.     Defendants and their co-conspirators have participated in a combination and conspiracy to suppress and eliminate competition in the IV Saline Solution market by agreeing to restrict output and artificially fix, raise, stabilize and/or maintain the prices of IV Saline Solution sold in the United States.  The combination and conspiracy engaged in by Defendants and their co-conspirators constitutes an unreasonable restraint of trade in violation of the Sherman Act (15 U.S.C. § 1).

22.     As a direct result of the anticompetitive and unlawful conduct alleged herein, Plaintiff and the Class paid artificially inflated prices for IV Saline Solution during the Class Period.  Plaintiff and the Class have thereby suffered, and continue to suffer, antitrust injury to their business or property.

## JURISDICTION AND VENUE

23.     Plaintiff brings this action under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) to recover damages suffered by Plaintiff and the Class and to secure equitable and injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiff and the Class also seek attorneys' fees, costs, and other expenses under federal law.

24.     This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and 28 U.S.C. §§ 1331 and 1337.

25.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or

more Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

26.      This Court has *in personam* jurisdiction over Defendants because each, either directly or through the ownership and/or control of its subsidiaries, *inter alia*: (a) transacted business in the United States, including in this District; (b) sold or marketed IV Saline Solution throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; or (d) were engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants also conduct business throughout the United States, including in this District, and they have purposefully availed themselves of the laws of the United States.

27.      By reason of the unlawful activities alleged herein, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiff and members of the Class.  Defendants, directly and through their agents, engaged in activities affecting all states, to restrict output and fix, raise, maintain and/or stabilize prices in the United States for IV Saline Solution, which conspiracy unreasonably restrained trade and adversely affected the market for IV Saline Solution.

28.      Defendants' conspiracy and unlawful conduct described herein adversely affected persons and entities in the United States who directly purchased IV Saline Solution manufactured by Defendants, including Plaintiff and the members of the Class.

9

## PARTIES

### A.    Plaintiff

29.    Plaintiff Warren General Hospital is a health care facility located in Warren, Pennsylvania.  During the Class Period, Plaintiff purchased IV Saline Solution directly from one or more Defendants.  Plaintiff paid artificially inflated prices for IV Saline Solution and was thereby damaged as a result of Defendants' unlawful conduct.

### B.    Defendants

30.    Defendant Baxter International Inc. ("Baxter International") is a Delaware corporation headquartered in Deerfield, Illinois.  Baxter International manufactures and sells IV Saline Solution throughout the United States.

31.    Defendant Baxter Healthcare Corporation ("Baxter Healthcare") is a Delaware corporation with its headquarters in Deerfield, Illinois.   Baxter Healthcare operates as a subsidiary of Baxter International.  Baxter Healthcare manufactures and sells IV Saline Solution throughout the United States.   Baxter International and Baxter Healthcare are collectively referred to herein as "Baxter."

32.    Defendant Hospira, Inc. is a Delaware corporation headquartered in Lake Forest, Illinois.  Hospira, Inc. manufactures and sells IV Saline Solution throughout the United States.

33.    Defendant Hospira Worldwide, Inc. ("Hospira Worldwide") is a Delaware corporation headquartered in Lake Forest, Illinois.  Hospira Worldwide manufactures and sells IV Saline Solution throughout the United States.   Hospira, Inc. and Hospira Worldwide are collectively referred to herein as "Hospira."

34.    Various persons that are not named as Defendants herein have participated in the antitrust violations alleged herein and have performed acts and made statements in furtherance

thereof. Plaintiff reserves the right to name some or all of these persons as Defendants at a later date.

## AGENTS AND CO-CONSPIRATORS

35. B. Braun Medical Inc. ("B. Braun") is a Pennsylvania corporation headquartered in Bethlehem, Pennsylvania. B. Braun is a subsidiary of B. Braun Melsungen AG, a German corporation. B. Braun manufactures and sells IV Saline Solution throughout the United States. Throughout the Class Period, B. Braun acted as an agent and/or co-conspirator of Defendants with respect to the acts, violations and common course of conduct alleged herein.

36. Each Defendant acted as the principal of or agent for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

37. Various persons, partnerships, sole proprietors, firms, corporations, agents and individuals not named as Defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anticompetitive conduct. There is a finite number of co-conspirators and Plaintiff believes that their identities can be ascertained through Defendants' own records.

38. Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs.

11

## FACTUAL ALLEGATIONS

### A.    The IV Saline Solution Industry

39.    IV Saline Solution is comprised of 0.9% sodium chloride (salt) dissolved in water and is packaged in plastic bags, plastic bottles or glass.  IV Saline Solution is also referred to in the industry as "normal saline."

40.    IV Saline Solution is used to treat patients with a countless number of medical conditions, including preventing or treating dehydration caused by illnesses or surgery, and is also used to dilute IV medications.  IV Saline Solution is one of the most commonly used products in emergency medicine.

41.    IV Saline Solution must be kept sterile.  IV Saline Solution can become contaminated if the bag is punctured or contains particulates (*i.e.*, undissolved substances that are not intended to be present in the Solution), which can be generated during production or caused by the breakdown of coating or packaging materials.  Particulate matter may lead to adverse health consequences, such as vein irritation, inflammation, aggravation of preexisting infections, allergic reactions, and systemic embolization.  IV Saline Solution may be recalled if its sterility is compromised or if it is damaged, which may cause inadequate or inconsistent dosing.

42.    Hospitals are the largest purchasers of IV Saline Solution.  It is necessary for hospitals to stock large quantities and wide varieties of IV Saline Solution to treat the various symptoms encountered by patients on a daily basis.  According to Baxter, 740 units of IV Saline Solution and other sterile solutions are used each minute across the United States.[6]

---

[6] Erika Fry, *There's a national shortage of saline solution. Yeah, we're talking salt water. Huh?* FORTUNE (Feb. 5, 2015), http://fortune.com/2015/02/05/theres-a-national-shortage-of-saline/.

12

43.     Defendants are the largest manufacturers of IV Saline Solution in the United States and collectively control approximately 90% of the market.

**B.     The Purported IV Saline Solution Shortage**

44.     As early as November 2013, Defendant Baxter notified customers that a shortage for IV Saline Solution existed, that shipments would be delayed and non-contracted customers would receive the product on an allocation system.  Defendants attributed the shortage to a harsher-than-expected 2013 to 2014 flu season and an increase in demand.

45.     In January 2014, the FDA publicly recognized a shortage of IV Saline Solution and added it to the FDA's Drug Shortage List.

46.     To ease the burden on the health care system due to the shortage, the FDA facilitated imports of IV Saline Solution from European plants that were not previously approved to ship IV Saline Solution into the United States.  The plants included Defendant Baxter's plant in Spain, co-conspirator B. Braun's plant in Germany, and Fresenius Kabi USA, LLC's plant in Norway.

47.     Despite the FDA's attempts to increase the supply of IV Saline Solution, the FDA recognized that imports "will not resolve the current shortage."[7]  Indeed, the supply of IV Saline Solution in the United States has not been replenished to previous levels, even with imported IV Saline Solution, and prices continue to rise.

48.     According to one customer, Defendants have represented that the purported shortage is expected to continue.

---

[7] *FDA updates on saline drug shortage*, FDA, http://www.fda.gov/Drugs/DrugSafety/ucm382255.htm.

13

49.     A shortage of IV Saline Solution has potentially dangerous consequences on patient care and is leading to a health care crisis.  The FDA describes the current IV Saline Solution shortage as a "critical shortage, which poses a serious threat to patients."[8]

50.     Health care facilities have attempted to cope with the purported IV Saline Solution shortage by conserving supplies.  The American Society of Health-System Pharmacists ("ASHP") issued guidance in March 2014 advising clinicians to conserve IV Saline Solution by "using oral hydration whenever possible" and to "consider flushing central venous access devices 1-3 times per week rather than daily."[9]

51.     The Veterans Health Administration, the largest healthcare system in the country, stated that the IV Saline Solution shortage is a "serious concern" and that it has been required to implement operational changes to manage care in light of the limited supply.

52.     A scramble to find supplies during a shortage can cause a delay in patients' treatment "and in the emergency room . . . [a] few minutes in these situations can be crucial."[10] The purported IV Saline Solution shortage is causing health care facilities to "improvise with what they've got."  Pharmacists have discussed "bartering medical supplies among one another, and spending an unprecedented number of hours tracking down supply and scrambling together substitutes."[11]

---

[8] *Id.*

[9] Fry, n.6 *supra.*

[10] Weiner, n.3 *supra.*

[11] Fry, n.6 *supra.*

14

53.     According to David Jaspan, RPh, director of pharmacy and materials management at Union Hospital in Elkton, Maryland, who spends part of his week locating alternatives to IV Saline Solution, "we find ourselves struggling to manage with what we have."  Jaspan described how the Hospital ran out of its supply of IV Saline Solution less than a week after receiving a delivery of IV Saline Solution and other IV fluids.[12]

54.     Drug shortages have a significant financial impact on health care facilities.  It is estimated that U.S. health care facilities spend $216 million a year in labor costs associated with managing drug shortages.  The current IV Saline Solution shortage is expected to be the most expensive drug shortage in history.

### C.     Congress Urges The FTC To Investigate Defendants For Conspiring to Restrict Output And Increase Prices of IV Saline Solution

55.     On October 26, 2015, a bipartisan group of Senators, including Mike Lee (R-Utah) and Amy Klobuchar (D-Minn.), who are the Chairman and ranking member, respectively, of the Judiciary Subcommittee on Antitrust, Competition Policy and Consumer Rights, along with Richard Blumenthal (D-Conn.) and Orrin G. Hatch (R-Utah), wrote a letter to the FTC urging it to investigate Defendants for violations of the federal antitrust laws in connection with the manufacture and sale of IV Saline Solution.

56.     Specifically, the Senators accuse Defendants of potentially conspiring to create and maintain an artificial IV Saline Solution shortage to increase prices 200-300%.  They noted that, while price increases can help end shortages, the IV Saline Solution shortage is still ongoing

---

[12] Lena J. Weiner, *IV Fluids Shortage Continues in Hospitals*, HEALTHLEADERS MEDIA, (Sept. 25, 2014), http://www.healthleadersmedia.com/quality/iv-fluids-shortage-continues-hospitals.

15

after nearly two years, raising questions about Defendants' motivations for solving the shortage and "possible coordination among them."[13]

57.     In December 2015, the FTC informed one of the Senators that it would not confirm or deny whether the FTC is investigating the Defendants.

> **D.     Defendants Unlawfully Stifled Competition by Colluding to Restrict Output and Increase Prices for IV Saline Solution**

58.     Defendants engaged in a collusive scheme to control and reduce output and thereby artificially fix the prices of IV Saline Solution during the Class Period. Defendants used the purported shortage of IV Saline Solution, which they created, as a pretext for unlawful and collusive price increases.

59.     Defendants implemented their unlawful anticompetitive output restriction scheme through several methods. First, to create and maintain the purported shortage of IV Saline Solution, Defendants announced several voluntary and nearly parallel recalls. Second, Defendants signaled their output restrictions and prices increases to each other through publicly available communications with customers and the FDA. Lastly, Defendants pressured customers to abide by similar restrictive purchasing terms and artificially inflated prices. As a result, Defendants effectively reduced the supply of IV Saline Solution, created and exploited a purported shortage and panic in the market, and charged customers, including Plaintiff and members of the Class, artificially inflated supracompetitive prices.

---

[13] Press Release, n.4 *supra*.

16

### 1. Defendants Issued A Series of Voluntary Product Recalls And To Create And Maintain Their Output Control Conspiracy

60.     Between 2010 and 2012, voluntary recalls of IV Saline Solution were infrequent, sporadic, and primarily issued by a single manufacturer of IV Saline Solution, Defendant Hospira.

61.     Starting in 2013, Defendants Baxter and Hospira both began to frequently and voluntarily recall IV Saline Solution within weeks or days of each other for similar purposes (*e.g.*, potential for solution leaks, port defects, and particulate matter).   In particular, the following voluntary recalls for IV Saline Solution were announced around the same time:

   a) On May 21, 2013, Defendant Baxter issued a voluntary recall of its IV Saline Solution due to the purported potential for leakage.  On June 6, 2013, Hospira issued a voluntary recall of its IV Saline Solution, also purportedly due to the potential for leakage.

   b) On October 14, 2014, Defendant Hospira issued a voluntary recall of its IV Saline Solution due to the purported potential of punctures which may result in leaks. That recall alone was for nearly 16.5 million IV Saline Solution bags.

   c) On December 8, 2014, Defendant Baxter followed suit with its own voluntary recall of 542,080 container bags, purportedly due to the presence of particulate matter.   A mere two weeks later, on December 22, 2014, Defendant Hospira issued a voluntary recall of 30,840 IV Saline Solution bags, which it blamed on the purported potential for leakage.

   d) On March 18, 2015, Baxter issued another voluntary recall of a large amount of IV Saline Solution, 597,498 units, purportedly due to complaints received regarding missing closures or leaks. Less than three weeks later, on April 7, 2015,

Defendant Hospira issued a voluntary recall of IV Saline Solution due to the purported potential for solution leak.

e) On July 2, 2015, Defendant Hospira issued a voluntary recall, purportedly due to the potential for channel leak. Soon thereafter, on July 17, 2015, Defendant Baxter issued a voluntary recall due to the purported presence of particulate matter.

62. Defendants' voluntary recalls had a substantial impact on the available supply of IV Saline Solution in the U.S. market. As reported by the Journal of Healthcare Contracting, approximately 20 million bags of IV Saline Solution are used per month in the United States. By this estimate, Defendant Hospira's voluntary recall in October 2014 alone removed approximately 82.5% of IV Saline Solution bags from the U.S. market for that month. During the fourth quarter of 2014, voluntary recalls by Defendants Baxter and Hospira collectively removed approximately 28.5% of IV Saline Solution bags from the U.S. market.

63. The multiple overlapping voluntary recalls of the two largest competitors for IV Saline Solution in the United States before and during a time of a purported supply shortage and increasing prices is highly indicative of an output restriction and price-fixing conspiracy.

64. Indeed, prices for IV Saline Solution rose as the recalls had a cumulative impact on the market. The U.S. Centers for Medicare and Medicaid Services reported that prices of IV Saline Solution that was sold to the U.S. government rose approximately 36% between the fourth quarters of 2014 and 2015. This price increase is undoubtedly larger for private customers who, according to the Senators, have paid price increases of 200-300% since the purported shortage began.

18

65.     Through their collusive voluntary recalls, Defendants implemented their unlawful and anticompetitive scheme to create and maintain a supply shortage to charge supracompetitive prices for IV Saline Solution.

**2.      Defendants Signaled The Timing And Frequency Of Their Intended Output Restrictions And Price Increases Through The FDA's Shortage Website**

66.     Defendants used the FDA's publicly accessible Drug Shortage database to engage in price signaling (*i.e.*, the intentional sharing of competitive information) to ensure that all Defendants also restricted output and promoted higher prices.

67.     The FDA's Drug Shortage website includes information from manufacturers on their availability of certain drugs and medical products, the estimated duration of their purported shortages, and when they plan to resume production.  The website also includes the manufacturers' claimed "shortage reason," which may include: requirements related to complying with good manufacturing practices; regulatory delay; shortage of an active ingredient; shortage of an inactive ingredient component; discontinuation of the manufacture of the drug; delay in shipping of the drug; demand increase for the drug; and other.

68.     During the Class Period, Defendants submitted customer letters to the FDA's Drug Shortage website at or near the same time.  The Defendants each listed the purported reasons for their IV Saline Solution supply constraints (either "demand increase" or "other") and detailed their intentions to place customers on allocation.

69.     On December 16, 2013, Defendant Baxter submitted the first customer letter to the FDA, which stated that it would temporarily suspend the manufacturing of 150 mL IV Saline Solution to meet higher demands for 250 mL IV Saline Solution.

70.     Thereafter, on the same day, January 17, 2014, Defendants Hospira and Baxter submitted customer letters to the FDA concerning the purported IV Saline Solution shortage and

19

indicating that customers would be put on allocation. Hospira's January 17, 2014 letter also contained additional Hospira IV solution products that it was placing on allocation, purportedly due to heavy demand from that year's flu season and industry supply constraints. The other IV solution products included 5% Dextrose, 5% Dextrose and 0.45% Sodium Chloride, Lactated Ringer's Solution, and Normosol-R and Dextrose.

71. On March 12, 2014, Defendant Baxter again submitted a customer letter to the FDA regarding the purported shortage and its product allocation. In this letter, Baxter stated that it was expanding its list of allocated products to include certain of the same IV solution products that Hospira listed in its January 17, 2014 letter, including 5% Dextrose, 5% Dextrose and 0.45% Sodium Chloride, and Lactated Ringer's Solution.

72. On May 28, 2014, co-conspirator B. Braun followed Baxter and Hospira's lead by submitting a customer letter to the FDA. B. Braun's letter stated that it was experiencing shortages of IV solution products, including IV Saline Solution and 5% Dextrose, and tightly managing its inventory though an allocation and fulfillment process.

73. While the FDA has stated that it is working with all Defendants to address the purported IV Saline Solution shortage, Defendants are using this communication as a means to facilitate their conspiracy. As recognized by Hospira spokesman Dan Rosenberg, "Hospira is communicating with the [FDA's] Drug Shortage staff openly and continuously to support the Agency **and other companies** in taking appropriate measures to coordinate resolution."

74. These facts highly suggest that Defendants signaled to each other, through public statements, their planned unlawful collusive output restrictions and price increases for IV Saline Solution by using the purported supply shortage as a pretext for their conspiratorial and anticompetitive conduct.

20

3. **Defendants Exploited Their Market Power And The Purported IV Saline Solution Shortage By Collusively Pressuring Customers To Abide By Restrictive Purchasing Terms**

75. Defendants also collusively exploited their market power and the purported IV Saline Solution shortage by pressuring customers to purchase more products than IV Saline Solution alone. According to the bi-partisan group of Senators in their letter to the FTC, suppliers of IV Saline Solution, such as Defendants, informed hospital customers that they "would not be able to purchase any saline at any price unless the hospital also purchased additional products."

76. For instance, the Senators described reports from hospitals that Defendants and co-conspirator B. Braun "are imposing even greater price increases on customers who do not also purchase additional non-saline products," such as pumps, tubing and catheters through which IV Saline Solution is delivered to patients. The Senators also recognized that Defendants and co-conspirator B. Braun were able to "lock their customers into long term contracts."

77. The Senators called the Defendants' actions "troubling" and stated that they "pose a potential risk to the wellbeing of patients by forcing hospitals to purchase products they may believe to be clinically inferior and add significant costs to our health care system."

78. In a truly competitive market, it would be in the independent economic self-interest of each IV Saline Solution supplier to lower its prices for IV Saline Solution and sell IV Saline Solution separately from other products. By collectively imposing price increases on IV Saline Solution customers and pressuring customers to abide by similar restrictive purchasing terms, Defendants acted contrary to their economic self-interests. Defendants' conduct is highly suggestive of a price-fixing conspiracy in the IV Saline Solution market.

21

**E.      Defendants' Conspiracy Had The Purpose And Effect Of Raising Prices For
IV Saline Solution In The United States During The Class Period**

79.      Defendants' scheme to collusively manipulate and control the supply of IV Saline
Solution had the purpose and effect of raising prices of IV Saline Solution to supracompetitive
levels.

80.      Indeed, according to pricing information obtained from the U.S. Centers for
Medicare and Medicaid Services, prices for IV Saline Solution began increasing in mid-2013 and
spiked in early 2014.  Prices of IV Saline Solution continue to rise today.  Figure 1 below reflects
the price increases for 1000 mL containers of IV Saline Solution that were sold to the U.S.
government.

**Figure 1**



81.      Figure 2 below reflects the price increases for 250 mL and 500 mL containers of
IV Saline Solution that were sold to the U.S. government.

22



**Figure 2**



82.     While Figures 1 and 2 relate to the average prices of IV Saline Solution charged to the U.S. government, according to the bipartisan group of Senators, prices paid by other purchasers of Defendants' IV Saline Solution, including Plaintiff and members of the Class, have increased 200-300%.

83.     As reflected in Figure 3 below, net sales of Defendants Baxter and Hospira increased substantially during the Class Period as they collusively engaged in their unlawful anticompetitive scheme.

23

**Figure 3**



84.    Defendants touted their price increases of IV Saline Solution and the exploitation of their customers during the purported shortage.

85.    Robert L. Parkinson, Jr., the Chairman and Chief Executive Office ("CEO") of Defendant Baxter, stated during a July 2014 earnings call that he thought IV solutions, "which are essential to saving and sustaining lives" were "the best deal in healthcare" and priced lower "than a bottle of water at SevenEleven."  Given that Parkinson perceived IV solutions to be undervalued, he indicated that he saw a business opportunity in increasing prices of and margins on IV solutions during the "recent IV shortage in the U.S.," which he believed "has sensitized a lot of people to the value of these products."

86.    Also in July 2014, media outlets reported that Defendant Hospira was about to double or triple its prices for IV Saline Solution.

87.    Indeed, during the purported shortage, Defendants attributed their rise in net sales to their price increases for IV solutions.  For example, in its earnings call for the second quarter of 2014, Defendant Baxter stated that its 8% sales increase in its Fluid Systems franchise (which

24

includes IV Saline Solution) was driven in part by "pricing for IV solutions." Again, in Baxter's 10-Q for the third quarter of 2014, it stated that "price improvements" for IV therapies (which include IV Saline Solution) contributed to a 4% net sales growth in its Fluid Systems franchise.

88.    Similarly, in the first quarter of 2014, Defendant Hospira reported during an earnings call that it was "seeing some uptick in IV solutions prices" and a 19% increase in net sales in its Other Pharma segment, which includes IV Saline Solution. In the third quarter of 2014, Hospira reported a significant 43% increase in its Other Pharma segment compared to the same quarter for 2013. During Hospira's earnings call for that quarter, F. Michael Ball, Hospira's CEO, stated that this increase was "primarily driven by the strong performance from our solutions products, which benefitted from the continued strong demand from protracted market shortages."

89.    During a May 2015 investor conference, Defendant Baxter's CEO, Parkinson, indicated that, even though business was "slower . . . we've been actually increasing prices in the U.S. on IV solutions."

90.    Defendants' price increases for IV Saline Solution cannot be explained by the purported shortage alone. The bipartisan group of Senators recognized that, although "prices tend to increase during a shortage," the price increases for IV Saline Solution "appear to be outside the bound of natural market forces." The Senators further stated to the FTC that "[t]he ongoing shortage, the fact that the shortage has not cleared even with significant price increases, and the behavior reported by hospitals raises questions about potential coordination between the saline suppliers."[14]

---

[14] Press Release, n.4 *supra*.

25

91.     Indeed, Craig Garthwaite, an economist and assistant professor of strategy at the Kellogg School of Business at Northwestern University, stated that "[s]aline shortages are something that shouldn't happen, they baffle economists."[15]

## F.     The IV Saline Solution Market Structure And Characteristics Support The Existence Of A Conspiracy

92.     The relevant product market for purposes of this Complaint is the IV Saline Solution market.  The relevant geographical market is the United States.

93.     The structure and other characteristics of the market for IV Saline Solution in the United States make it conducive to a price-fixing agreement among market participants and have made collusion particularly attractive.  Specifically, the IV Saline Solution market: (1) is highly concentrated; (2) has high barriers to entry; (3) has inelastic demand; (4) is highly homogenized; (5) has abundant opportunities for Defendants to meet and conspire; and (6) is comprised of participants who have motives to conspire.  Additionally, facts exist that are highly indicative of a price-fixing conspiracy, including that: prices increased while input prices remained stable or were declining; there was no corresponding IV Saline Solution shortage during other flu outbreaks; and Defendant Baxter is a recidivist violator of the antitrust laws.

## 1.     The Market For IV Saline Solution Is Highly Concentrated

94.     A highly-concentrated market is more susceptible to collusion and other anticompetitive practices.

---

[15] Valerie Lapointe, *Hospital Drug Shortages: What is Really Causing Them?*, MEDILL REPORTS CHICAGO (May 26, 2016), http://news.medill.northwestern.edu/chicago/hospital-drug-shortages-what-is-really-causing-them/.

95.     The IV Saline Solution market is highly concentrated.  Only three manufacturers control nearly 100% of the United States IV Saline Solution market.  As demonstrated in Figure 4 below, Defendants Baxter and Hospira each maintain an approximately 45% market share in the IV Saline Solution market.  Co-conspirator B. Braun holds the remaining 10% market share.

**Figure 4**



96.     The Herfindahl–Hirschman Index ("HHI") measures the competitive concentration of a particular industry.  An HHI of 0 indicates a perfectly competitive market. The higher the number, the less competitive the market.  Figure 5 below provides the ranges of HHI concentration levels used by the U.S. Department of Justice and FTC to classify markets as unconcentrated, moderately concentrated, and highly concentrated.  The higher the market concentration, the easier it is to effectively execute price fixing.

**Figure 5**

**Concentration Levels**

| Level | HHI |
|---|---|
| Highly Concentrated | > 2,500 |
| Moderately Concentrated | 1,500 to 2,500 |
| Unconcentrated | < 1,500 |

27

97.     The HHI for the IV Saline Solution market is 4,150.  Thus, the IV Saline Solution market is highly concentrated and conducive to a price-fixing conspiracy.

### 2.     The Market For IV Saline Solution Has High Barriers To Entry

98.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing.  When, however, there are significant barriers to entry, new entrants are much less likely to enter the market.  Thus, barriers to entry help facilitate the formation and maintenance of a cartel.

99.     Significant barriers preclude, reduce, or make more difficult for competitors to enter the IV Saline Solution market.  IV Saline Solution production is capital intensive.  It would take years for a new market entrant to establish the necessary manufacturing plants where IV Saline Solution could be produced.  FDA economist Marta Wosinska estimated that it would take three to five years, and hundreds of millions of dollars, to open a new IV Saline Solution plant.[16]  Any new plant will also need to meet strict FDA requirements, adding additional burdens and costs on a potential entrant.

100.     According to an industry report, Defendants have also become increasingly vertically integrated by acquiring companies within the IV Saline Solution supply chain.  As a result, Defendants' per-unit production costs were expected to decrease.  It would be onerous and time-consuming for a potential market entrant to gain the economies of scale already achieved by Defendants to effectively compete with them on prices of IV Saline Solution.

---

[16] Dembosky, n. 2, *supra*.

28

101.    Additionally, establishing a sophisticated distribution network would require a great deal of time and investment by a new entrant.

### 3.      The Demand For IV Saline Solution Is Inelastic

102.    "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other.  For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any.  In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

103.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices.  Otherwise, increased prices would result in declining sales, revenues, and profits as customers purchased substitute products or declined to buy altogether.  Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

104.    Demand for IV Saline Solution is highly inelastic.  A small, non-transitory increase in the price for IV Saline Solution would not cause purchasers to switch to another product in significant enough numbers to overcome the price increase.

105.    IV Saline Solution is an essential product that health care facilities must have in stock at all times to treat patients with a countless number of medical conditions.

106.    There is no adequate alternative for health care facilities other than IV Saline Solution.  Other forms of saline cannot replace IV Saline Solution because it is specifically designed to be administered through injection.  The ASHP issued a bulletin warning health care providers that saline solutions designed for irrigation cannot be used as a substitute for IV Saline

29

Solution during the shortage. According to ASHP, the irrigation saline is not approved for injection due to the potential of having higher levels of particulates.[17]

107.    Moreover, although a type of saline can be administered orally, it is not an adequate substitute for many patients who are unable to ingest fluids and must receive them intravenously. IV Saline Solution is also superior to saline administered orally because it is absorbed by a patient's body more quickly.

### 4.    IV Saline Solution Is A Highly Homogeneous Product

108.    When products or services offered by different suppliers are viewed as interchangeable by customers, it is easier for suppliers to unlawfully agree on the price for the product or service in question, and it is easier to effectively police the collusively set prices. This makes it easier to form and sustain an unlawful cartel.

109.    IV Saline Solution is a ubiquitous medical product. All Defendants' IV Saline Solution meets the same specifications: 0.9% sodium chloride dissolved in water in injectable form.

110.    Because all IV Saline Solution is the same, the core consideration for a health care facility when purchasing the product is price.

111.    The interchangeability of IV Saline Solutions facilitated Defendants' conspiracy by enabling coordination on price that would be more difficult if purchasers were able to choose from various distinct types of IV Saline Solution to meet their medical care needs.

---

[17] *Critical Shortage of i.v. Saline Solution*, AMERICAN SOCIETY OF HEALTH-SYSTEM PHARMACISTS (Jan. 17, 2014), http://www.ashp.org/menu/News/NewsCapsules/Article.aspx?id=524.

**5.     Defendants Had Ample Opportunities To Meet and Conspire**

112.    Defendants, direct competitors and market leaders in the IV Saline Solution industry, had numerous opportunities to meet and conspire under the guise of legitimate business contacts and perform acts necessary for the operation and furtherance of the conspiracy.    In particular, Defendants were members of industry associations, which afforded them the opportunity to meet and have improper discussions to enter into and further their anticompetitive agreement.

113.    For example, all Defendants are members of the Advanced Medical Technology Association ("AdvaMed").  AdvaMed is a trade association that holds numerous conferences and workshops throughout the year covering topics in the medical industry and promotes meetings held by federal agencies.

114.    Defendants Baxter and Hospira were both members of the Generic Pharmaceutical Association ("GPhA") during the Class Period.  Co-conspirator B. Braun was associated with GPhA previously.    GPhA is a trade association for manufacturers of pharmaceutical chemicals, generic prescription drugs and other medical goods and services used in the generic drug industry.  GPhA's website states that its "core mission is to improve the lives of patients and the U.S. healthcare system by advancing timely access to affordable generic medicines."    GPhA advances the interest of its members through scientific, regulatory and federal and state initiatives.  GPhA holds workshops and conferences throughout the year for its members.

115.    Moreover, Defendants Baxter and Hospira are located in close proximity, providing them with ease of access to each other to meet and conspire.  Both are headquartered in Illinois, with offices separated by less than 10 miles.

31

### 6. Defendants Had Motives To Conspire

116. Each Defendant was economically motived to collusively restrict output and increase prices of IV Saline Solution to supracompetitive levels.

117. Given that long-term contracts with certain customers were set to expire during the Class Period, Defendants were motivated to restrict output to create panic among customers to force them into long-term contracts with higher price terms. These contracts enabled Defendants to prolong the purported shortage and maintain their conspiracy while avoiding price competition and erosion of market share.

118. According to the bipartisan group of Senators, "[e]ven absent coordination, [Defendants'] ability to extract several-hundred-percent price increases and to lock their customers into long term contracts is likely reducing their incentive to alleviate this troubling shortage." The Senators recognized that Defendants' motivation to increase prices and further restrict output "further exacerbates the shortage and results in consumer harm."

119. Defendants and their co-conspirators were also motivated to conspire to enable their foreign affiliates to enter the U.S. market. To mitigate the shortage, the FDA allowed imports of IV Saline Solution from foreign countries. In particular, IV Saline Solution has been imported from Defendant Baxter's plant in Spain during the Class Period. Additionally, Baxter stated in its earnings call for the second quarter of 2015 that the FDA is reviewing its application to source IV Saline Solution from its plant in Mexico. Due to lower production costs in foreign countries like Mexico, Defendants and their co-conspirators were motivated to continue the shortage to increase their margins on U.S. sales of IV Saline Solution that were manufactured by their foreign plants.

32

**7. IV Saline Solution Prices Rose Despite Falling Raw Material Prices And Defendants' Increased Economies Of Scale**

120.    Increasing prices for a product during a time of stable or decreasing input costs are indicative of a price-fixing conspiracy.  The drastic price increases of IV Saline Solution throughout the Class Period cannot be explained by an increase in raw material costs.

121.    The primary inputs for IV Saline Solution are plastic materials and resins, which are used to manufacture the packaging for IV Saline Solution (*e.g.*, plastic bags or bottles).

122.    As reflected in Figure 6 below, prior to and during the Class Period, the Producer Price Index for plastic remained stable and even dropped sharply during the last quarter of 2014.

**Figure 6**



123.    Moreover, according to an industry report, increased vertical integration in the IV Saline Solution industry as a result of mergers and acquisitions by Defendants safeguarded their profits against any rising costs associated with plastic prices.

124.    That Defendants' economies of scale increased and input costs remained stable or declined during the Class Period, while prices for IV Saline Solution increased drastically, is highly indicative of a price-fixing fixing conspiracy among Defendants.

33

**8.    Similar Supply Shortages And Price Increases For IV Saline Solution Did Not Occur During Other Flu Outbreaks**

125.    A harsher-than-expected 2013 to 2014 flu season alone cannot justify the extended IV Saline Solution shortages experienced through today and the 200-300% price increases for IV Saline Solution.

126.    According to a study conducted by the U.S. Centers for Disease Control and Prevention and published in 2004 by The Journal of the American Medical Association, between 1979 and 2001, approximately 200,000 people on average were hospitalized from seasonal influenza-related complications each year.  During earlier major flu outbreaks, there was no corresponding nationwide shortage of, or significantly increasing prices for, IV Saline Solution.

127.    For example, during the notable 2009 to 2010 global pandemic of the swine flu, or H1N1 virus, it was estimated that over 274,000 people in the United States were hospitalized due to the swine flu, in addition to those hospitalized for the regular flu season.  However, there was no shortage or substantial price increase for IV Saline Solution during that time.

128.    Thus, the purported supply shortage and escalating IV Saline Solution prices experienced throughout the Class Period cannot be attributed to a harsh flu season.

**9.    Defendant Baxter Is A Recidivist Violator Of The Antitrust Laws**

129.    This is not the first time a Defendant has been accused of creating a supply shortage of a medical product and using it as a pretext for an unlawful price increase.

130.    In 2009, while evaluating the anticompetitive effects of a proposed merger between CSL Ltd. ("CLS"), a manufacturer of blood plasma derivatives immunoglobulin and albumin ("plasma derivatives"), and a competitor, Talecris Biotherapeutics Holdings Corp., the FTC uncovered evidence regarding "troubling signs of coordinated behavior" among the "tight oligopoly" of firms in the plasma derivatives industry, including Defendant Baxter.

34

131.    Private class actions on behalf of direct and indirect purchasers of plasma derivatives against Baxter and CLS ensued.  The private plaintiffs alleged that, between 2003 and 2009, Baxter and its competitors exploited a supply shortage following plant shutdowns, restricted output and increased prices of plasma derivatives.  Baxter also allegedly engaged in price signaling by using meetings called by the FDA to address the shortage as a means to communicate with its competitors regarding supply levels and distribution of blood plasma. Baxter settled the class actions for $64 million in 2014.

132.    The allegations against Baxter relating to plasma derivatives bear a striking resemblance to the allegations of Defendants' wrongdoing alleged herein and support the existence of Baxter's participation in the conspiracy to restrict output and increase prices of IV Saline Solution as alleged herein.

## CLASS ACTION ALLEGATIONS

133.    Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class (the "Class"):

> All persons and entities in the United States who directly purchased IV Saline Solution sold by any of the Defendants, or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the period from and including January 1, 2013 through such time as the anticompetitive effects of Defendants' conduct cease.  Excluded from the Class are Defendants, their parent companies, subsidiaries, affiliates, agents, co-conspirators, federal governmental entities and instrumentalities of the federal government, and states and their subdivisions, agencies and instrumentalities.

134.    While Plaintiff does not know the exact number of the members of the Class, Plaintiff believes there are (at least) thousands of members.

35

135.    Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of the Class, thereby making appropriate relief with respect to the Class as a whole. Such questions of law and fact common to the Class include, but are not limited to:

(a)     Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to restrict output and fix, raise, maintain or stabilize the prices of IV Saline Solution;

(b)     The identity of the participants of the alleged conspiracy;

(c)     The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)     Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;

(e)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the members of the Class;

(f)     The effect of the alleged conspiracy on the prices of IV Saline Solution sold in the United States during the Class Period;

(g)     The appropriate injunctive and related equitable relief for Plaintiff and the Class; and

(h)     The appropriate class-wide measure of damages.

136.    Plaintiff's claims are typical of the claims of the members of the Class, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and all members of

the Class are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for IV Saline Solution sold by Defendants and/or their co-conspirators.

137.    Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class.  Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class.  Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

138.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

139.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

140.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## PLAINTIFF AND THE CLASS SUFFERED ANTITRUST INJURY

141.    Defendants' price-fixing conspiracy had the following effects, among others:

(a)     Price competition has been restrained or eliminated with respect to IV Saline Solution;

(b)     The prices of IV Saline Solution have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)     Purchasers of IV Saline Solution have been deprived of the benefits of free and open competition; and

(d)     Purchasers of IV Saline Solution paid artificially inflated prices.

142.     The purpose of the conspiratorial conduct of Defendants and their co-conspirators was to fix, raise, stabilize and/or maintain the price of IV Saline Solution.

143.     The precise amount of the overcharge impacting the prices of IV Saline Solution paid by Plaintiff and the Class can be measured and quantified.  Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge passed-through the chain of distribution.  Thus, the economic harm to Plaintiff and the members of the Class can be quantified.

144.     By reason of the alleged violations of the antitrust laws, Plaintiff and the members of the Class have sustained injury to their businesses or property, having paid higher prices for IV Saline Solution than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined.  This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

**FIRST COUNT**
**Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**
**(Conspiracy in Restraint of Trade)**

145.     Plaintiff repeats the allegations set forth above as if fully set forth herein.

146. Defendants and unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

147. The acts done by each of Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

148. During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for IV Saline Solution.

149. The conspiratorial acts and combinations have caused unreasonable restraints in the market for IV Saline Solution.

150. As a result of Defendants' unlawful conduct, Plaintiff and other similarly situated purchasers in the Class who purchased IV Saline Solution have been harmed by being forced to pay inflated, supra-competitive prices for IV Saline Solution.

151. In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

152. Defendants' conspiracy had the following effects, among others:

(a) Price competition in the market for IV Saline Solution has been restrained, suppressed, and/or eliminated in the United States;

39

(b) Prices for IV Saline Solution provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c) Plaintiff and members of the Class who purchased IV Saline Solution from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

153. Plaintiff and members of the Class have been injured and will continue to be injured in their business and property by paying more for IV Saline Solution purchased from Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

154. The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

155. Plaintiff and members of the Class are entitled to treble damages and an injunction against Defendants, preventing and restraining the violations alleged herein.

WHEREFORE, Plaintiff demands judgment that:

1. The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

2. That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

(a) An unlawful unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; and

40

(b)    A *per se* violation of Section 1 of the Sherman Act;

3.    Plaintiff and the members of the Class recover damages, to the maximum extent allowed under the federal antitrust laws, and that a joint and several judgment in favor of Plaintiff and the members of the Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

4.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

6.    Plaintiff and the members of the Class be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

8.    Plaintiff and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

9.    Plaintiff and members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

41

Dated: December 14, 2016        Respectfully submitted,

/s/ Steven A. Kanner
Steven A. Kanner
William H. London
Douglas A. Millen
Robert J. Wozniak
**FREED KANNER LONDON & MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
Facsimile: (224) 632-4521
skanner@fklmlaw.com
wlondon@fklmlaw.com
dmillen@fklmlaw.com
rwozniak@fklmlaw.com

W. Joseph Bruckner
Heidi M. Silton
Brian D. Clark
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
wjbruckner@locklaw.com
hmsilton@locklaw.com
bdclark@locklaw.com

Arthur N. Bailey
Marco Cercone
R. Anthony Rupp, III
**RUPP BAASE PFALZGRAF & CUNNINGHAM, LLC**
1600 Liberty Building
424 Main Street
Buffalo, NY 14202
Telephone: (716) 854-3400
Facsimile: (716) 332-0336
bailey@ruppbaase.com
cercone@ruppbaase.com
rupp@ruppbaase.com

*Counsel for Plaintiff and the Putative Class*

42